DONALD RAY WILSON V. STATE

No. 33,657.   November 1, 1961
Motion for Rehearing Overruled January 3, 1962

574

■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■

*Robert Kilpatrick,* Cleburne, and *George McManus,* Ft. Worth, for appellant.

*Leon Douglas,* State's Attorney, Austin, for the state.

DICE, Judge.

Murder is the offense; the punishment, death.

The state's proof shows that the deceased, James Edward Layland, seventy-eight years of age, lived alone on a small farm located approximately three miles northeast of the city of Cleburne on what was known as the old Mansfield Road. On the afternoon of November 29, 1960, appellant and a companion, John Leonard Watson, appeared in the neighborhood, on foot, seeking assistance in moving appellant's automobile from a road where it had struck a rock. They first came to the house of Claude Campbell, which was across the road from the deceased's home, and then went to the home of the deceased where the deceased and a neighbor, C. W. Williams, were watching television. Efforts to move the automobile culminated in Campbell towing the automobile from the road into his pasture with a tractor. The automobile was moved around the middle of the afternoon, after which appellant and his companion left, walking in the direction of the deceased's home.

At 5 p.m., the deceased's neighbor, Williams, who had returned to his home, observed two men running from the deceased's barn across a field. At 5:20 p.m., Williams went to the home of the deceased where his attention was attracted to a dog barking at the barn. He then proceeded to the barn, where he observed the deceased's dead body lying inside that portion of the building used for a chicken house. When found, the body of the deceased was lying in its back, covered with blood, and it appeared to have been dragged inside the barn.

In the investigation which ensued, it was discovered that the deceased's house had been pilfered, a desk drawer had been torn open and the contents thrown on the floor and certain articles had been taken from the closets and a chest of drawers and thrown on the floor.

An autopsy performed upon the deceased's body by Dr. Tolbert F. Yater revealed multiple bruises, cuts, and lacerations about the head and neck and other cuts and stab wounds on the body. Dr. Yater testified that in his opinion the cause of death of the deceased was a stab wound in the back.

Appellant and his companion were arrested and taken into custody by Deputy Sheriff Bobby Pollard around 7 p.m. on the evening in question when they drove up in a wrecker, with its owner, to where appellant's automobile had been left in the pasture. When taken into custody, appellant was wearing a blue suit, which did not fit him, and a khaki shirt which had the name "Ed Layland" in the collar. A khaki shirt was found in the wrecker cab, on the floor, which was also labeled with the same name.

Upon being questioned by the officers, appellant admitted that he killed the deceased and accompanied them to a location on a fence row, approximately three-quarters of a mile from the deceased's home, where he pointed out and recovered a knife and scabbard, which knife he admitted he used in the killing. Some bloody clothing was also found on the fence row, which appellant stated he was wearing at the time he killed the deceased.

Appellant's written confession, made to State Ranger George M. Roach, was introduced in evidence without objection .

The confession, omitting the formal portions, reads in part as follows:

"* * * on Tuesday, November 29, 1960, Leonard Watson and I left Dallas in my car, a 1949 Ford, about noon and we got to Cleburne about 3 :00 P.M. on the same day. We turned off of highway 67 just after we passed Keene. We turned north off the highway, and I lost control of the car and ran off in a bar ditch near Mr. Campbell's house, which I believe is called the Mansfield Road. It is about four miles northeast of Cleburne in Johnson County, Texas. I went up to Mr. Campbell's and asked about his sons, Dan and Charles, but neither of them was there. We then went to Uncle Ed's house on the Mansfield Road. My granddad, C. W. xxxDRW Williams was there and he tried to pull my car out of the ditch with his car, but he could not pull it out. Then we went

back to Campbell's house and Mr. Campbell took his tractor and pulled *my* car out of the ditch and took it to his house. Then Leonard and I went back to Uncle Ed's house. The man I call "Uncle Ed" is not actually my uncle, but everyone in the neighborhood called him by that name. I believe his name is Ed Layland. We watched television for a while. We talked a while. I read the funnies in the Sunday paper, which was still in the house. Then we went to the chicken house. Leonard, uncle Ed and I *went out there* and uncle Ed fed the chickens. Leonard went outside. While uncle Ed and I were in the chicken house I thought he had some money and I decided to kill him. I had been thinking about it all the time we were there. I started choking him and got him down on the ground, and then I hit him with a rock two or three times. The rock is a little bigger than my hand and it has a sharp point on it. After I hit him with the rock I let him up and he started to holler for help, and hit him with my fist and knocked him down, and he started to get up and tried to hit me or choke me and then I hit him in the gut with my knife. Then Leonard and I went back to uncle Ed's house where I changed clothes.

"Donald Ray Wilson

"I put on some of uncle Ed's clothes. I put my clothes in a paper sack. I got uncle Ed's billfold out of his pocket after I stabbed him. Leonard and I divided the money equally. I threw the billfold down beside the road, but when the officers took me back out to look for it, we could not find it. I hid my clothes and my kinfe in a fence row, and I took the officers and showed them where the clothes and the knife were hidden. I got some clothes and some change out of the house after I stabbed uncle Ed. Leonard Watson and I went through the house to see what we could find * * *."

The state's proof further shows that a set of fingerprints, photographed on a glass top of the desk in the deceased's home, were identical with fingerprints taken from appellant. A blood specimen taken from the deceased's body, upon being examined in the crime laboratory of the State Department of Public Safety, was shown to be type "0." An examination of blood stains on the clothing which appellant was wearing at the time of the killing revealed that the same was human blood and of type "0." An examination of blood stains on the knife which appellant admitted he used in killing the deceased and those on a rock a little larger than a man's hand and having a sharp point,

which was found near the chicken house door, revealed that it was human blood but the chemist was unable to determine the type.

Appellant, testifying as a witness in his own behalf, stated that on the day in question he and his companion, Watson, came from Fort Worth to Cleburne to go fishing and he recounted how he struck the rock in the road and his efforts in getting the car removed. Appellant stated that he had consumed practically a half-pint of whisky that morning; that he and his companion had purchased two six-packs of beer and also two cases of beer; and that they had consumed fifty-three cans of beer. Appellant stated that in addition to drinking the whisky and beer he had taken three "red bird" or "yellow jacket" pills. He stated that he remembered going to the deceased's home, remembered going to the chicken house with the deceased and that his mind then went blank and he next remembered walking down the road with his companion, who told him that he (appellant) had stabbed the deceased. Appellant stated that he did not remember stabbing the deceased and that what he stated to the officers was what his companion told him had happened.

Appellant called his father as a witness, who testified that he had seen appellant drink and on one occasion saw him take two "yellow bird or yellow jacket" pills. Appellant also called as witnesses his mother and aunt, whose testimony was in substance that a grandfather and great-grandfather of appellant had died in the Terrell State Hospital for mental patients and that his sister had been an inmate of the Austin State School for mentally retarded children.

The court, in his charge, gave application to the provisions of Art. 36, V.A.P.C., and instructed the jury that in the event they found appellant guilty but believed that at the time of commission of the offense he was laboring under temporary insanity, produced by the recent use of ardent spirits, intoxicating liquor or narcotics or a combination thereof, they might take such temporary insanity into consideration in mitigation of the penalty attached to the offense.

Appellant predicates his appeal upon two contentions.

It is first contended that the court erred in overruling his amended motion for new trial based upon jury misconduct.

The motion, which was not verified by appellant or his counsel, alleged that "the jury, in reaching its verdict, considered and were influenced by unsworn testimony in direct violation of this court's directions and instructions." Attached to the motion was an affidavit of the juror, J. P. Stafford, taken before appellant's counsel, in which he swore that during the jury's deliberation "there was discussion to the effect that if he (appellant) received anything less than death he might get out in a few years or at some time in the future and get in more trouble."

The unverified motion and juror's affidavit, taken before appellant's counsel, were insufficient to require a hearing thereon, hence the court's action in overruling the motion is not before us. Carruthers v. State, 143 Tex. Cr. R. 45, 156 S.W. 2d 988; Ferguson v. State, 159 Tex. Cr. R. 169, 261 S.W. 2d 721.

The careful trial judge, however, did proceed to hear testimony in support of the motion and if his action in overruling the same was before us we would be unable to agree with appellant that the statement and discussion in the jury room constituted such misconduct as to call for a reversal of the conviction.

At the hearing, the juror Stafford testified that during the jury's deliberation. when they stood nine for punishment at death and three for life imprisonment, someone said that if they gave appellant life he "might get out in seven, eight, or ten years." The juror further testified that when such statement was made the foreman stated, "Now we must not discuss matters outside of the charge or the evidence," and that the discussion was then "hushed up." He further testified that the person who made the statement was not telling the jury appellant *would get out,* if assessed life imprisonment, and nothing was mentioned about the law with reference to when a person could or would get out of the penitentiary.

It is clear that the statement made was that appellant *might get out,* not that he *would get out,* in a certain number of years if given a life sentence. The statement was not an assertion of fact, as in Smith v. State, 169 Tex. Cr. R. 315, 333 S.W. 2d 385, and Mays v. State, 167 Tex. Cr. R. 339, 320 S.W. 2d 13, which, being erroneous, was held to constitute reversible error. Furthermore, the statement, although erroneous, appears to have been casually made and the discussion was promptly halted

by the foreman. Such would not call for a new trial. Greenwood v. State, 157 Tex. Cr. R. 58, 246 S.W. 2d 191; Tellez v. State, 162 Tex. Cr. R. 456, 286 S.W. 2d 154.

Appellant's remaining contention is that the court erred in overruling his motion for mistrial on the ground that the court permitted the state to recall Jewel Brady, the deceased's daughter, as a witness, to identify certain clothing of the deceased which had been previously identified and, while testifying, the witness became hysterical and created a commotion which was calculated to and did inflame the minds of the jury. While the record reflects that the witness, while testifying, was crying, there is nothing in the record which supports the allegation in appellant's motion that she became hysterical and so conducted herself as to inflame the minds of the jury. The court did not err in permitting the state to recall the witness for the purpose of identifying the clothing as belonging to the deceased. The clothing had only been identified as clothing worn by the appellant and had not been positively identified as clothing belonging to the deceased. The contention is overruled. ruled.

The evidence shows an unprovoked murder of the deceased and amply supports the jury's verdict. Appellant has received a fair trial and no reversible error is perceived.

Appellant's court-appointed counsel are to be commended upon their representation of him in the trial court and in this court on appeal.

The judgment is affirmed.

Opinion approved by the Court.